GUTRIDE SAFIER LLP
Seth A. Safier (State Bar No. 197427)
seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIO MARGIOTTA and KRISTEN KUCERA, as individuals, on behalf of themselves, the general public, and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SONY ELECTRONICS, INC.,<br><br>Defendant. | CASE NO.<br><br>CLASS ACTION COMPLAINT FOR INVASION OF PRIVACY; INTRUSION UPON SECLUSION; WIRETAPPING IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 631); COMMON LAW FRAUD, DECEIT AND/OR MISREPRESENTATION; AND UNJUST ENRICHMENT<br><br>JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

INTRODUCTION ... 1
THE PARTIES ... 3
JURISDICTION AND VENUE ... 3
TOLLING AND RELATED ARBITRATION PROCEEDINGS ... 3
SUBSTANTIVE ALLEGATIONS ... 5
A. Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies. ... 5
B. Defendant Falsely Informed Users That They Could Decline the Website's Use of "All" Cookies. ... 11
C. The Private Communications Collected As a Result of Third-Party Cookies Transmitted When Visiting Defendant's Website. ... 15
1. The Website Causes the Interception of the Contents of Communications. ... 15
2. Google Cookies. ... 18
3. TikTok Cookies. ... 26
4. Reddit Cookies. ... 33
D. The Third Parties Intercept User Communications While in Transit. ... 38
E. The Private Communications Collected are Valuable. ... 40
PLAINTIFFS' EXPERIENCES ... 41
CLASS ALLEGATIONS ... 47
CAUSES OF ACTION ... 49
First Cause of Action: Invasion of Privacy ... 49
Second Cause of Action: Intrusion Upon Seclusion ... 51
Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631) ... 53
Fourth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation ... 56
Fifth Cause of Action: Unjust Enrichment ... 60
PRAYER FOR RELIEF ... 61

Plaintiffs Mario Margiotta and Kristen Kucera (collectively, "Plaintiffs") bring this action on behalf of themselves, the general public, and all others similarly situated against Sony Electronics, Inc. ("Defendant" or "Sony"). Plaintiffs' allegations against Defendant are based on information and belief and the investigation of Plaintiffs' counsel, except for allegations specifically pertaining to Plaintiffs, which are based on their personal knowledge.

## INTRODUCTION

1. This Class Action Complaint concerns egregious violations of consumer privacy and a breach of consumer trust in violation of California law. When consumers visit Defendant's ecommerce website (electronics.sony.com, the "Website"), Defendant displays to them a popup cookie consent banner. Defendant's cookie banner discloses that the Website uses cookies but expressly gives users the option to control how they are tracked and how their personal data is used. Defendant assures visitors that they can choose to "Decline All" cookies, as shown in the following screenshot:




2. Like most internet websites, Defendant designed the Website to include resources and programming scripts from third parties that cause those parties to place cookies and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data. Unlike many websites, however, Defendant affirmatively represented that users could browse the Website without being tracked, followed, or targeted by third-party data brokers and advertisers. Those representations were false.

3. Even after users elect to "Decline All" cookies, Defendant nonetheless caused multiple third parties—including Google LLC (YouTube and Google Play), ByteDance Ltd. (TikTok), and Reddit, Inc.—to place and/or transmit cookies that tracked users' website browsing activities and enabled the Third Parties to intercept their private communications on the Website (the "Third Parties").

4. Contrary to users' express declination of cookies and tracking technologies on the Website, Defendant caused cookies, including the Third Parties' cookies, to be sent to Plaintiffs' and other visitors' browsers, stored on their devices, and transmitted to the Third Parties along with user data. These cookies permitted the Third Parties to track and collect data in real time regarding Website visitors' behaviors and communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

5. The Third Parties analyze and aggregate this user data across websites and time for their own purposes and financial gain, including creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and performing targeted advertising and marketing analytics. Further, the Third Parties share user data and/or user profiles with unknown parties to further their financial gain.

6. This type of tracking and data sharing is exactly what the Website visitors sought to avoid when they clicked or selected the "Decline All" link on the Website's cookie consent banner. Defendant falsely told Website users that it respected their privacy choices and would refrain from tracking and data sharing when users rejected cookies. Despite receiving clear notice of users' lack of consent, Defendant ignored those choices and violated state statutes and tort duties owed to Plaintiffs and those similarly situated Website users.

## THE PARTIES

7. Plaintiff Mario Margiotta is, and was at all relevant times, an individual and resident of Pleasant Hill, California. Plaintiff Margiotta intends to remain in California and makes his permanent home there.

8. Plaintiff Kristen Kucera is, and was at all relevant times, an individual and resident of Elk Grove, California. Plaintiff Kucera intends to remain in California and makes her permanent home there.

9. Defendant Sony Electronics, Inc. is a Delaware corporation with its headquarters and principal place of business in San Diego, California.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; the proposed Class consists of at least 100 members; and Plaintiffs and Defendant are citizens of different states.

11. The injuries, damages and/or harm upon which this action is based occurred or arose out of activities engaged in by Defendant within, affecting, and emanating from, the State of California. Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and services provided to persons in the State of California. Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California.

12. Further, the Private Communications and data that Defendant causes to be transmitted to Third Parties are routed through servers located in California.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

14. Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

## TOLLING AND RELATED ARBITRATION PROCEEDINGS

15. The delayed discovery rule applies to Plaintiffs' and Class members' claims.

Plaintiffs and Class members were unaware that, despite selecting the "Decline All" cookies hyperlink on the cookie banner, thereby declining all personalized advertising and unnecessary cookies on the Website, Defendant nonetheless caused third-party cookies to be sent to their browsers, stored on their devices, and transmitted to the Third Parties along with their private user data. Plaintiffs and Class members could not reasonably have discovered this conduct at the time of their visits to the Website because it occurred through hidden, technical processes not visible to ordinary users. Nothing about Plaintiffs' or Class members' experiences on the Website would have alerted a reasonable user that their selections were not being honored. Plaintiffs lacked the technical expertise and specialized tools necessary to determine whether the Website honored their opt-out selections or instead continued transmitting their data notwithstanding those selections, and they did not discover Defendant's conduct until a later investigation revealed it.

16. On or about February 11, 2024, Defendant was notified by Plaintiffs' counsel that it was engaging in the conduct alleged herein, including causing third-party cookies and corresponding user data to be stored on consumers' devices and intercepted by third parties despite users' blocking of personalized advertising and unnecessary cookies and the sharing/selling of user information. Despite this notice, Defendant did not disclose this conduct to users.

17. The Website's Terms and Conditions effective on February 11, 2024 contain an arbitration provision that purports to require Website visitors to arbitrate disputes with Defendant before the American Arbitration Association ("AAA").

18. Accordingly, on November 11, 2024, Plaintiff Kucera filed a demand for arbitration against Defendant with the AAA in San Francisco. *See* Ex. A. Plaintiff Kucera's arbitration asserted claims arising from the same conduct alleged herein.

19. Arbitrator E. Gary Spitko was assigned as the arbitrator.

20. On June 2, 2025, Plaintiff Kucera and Defendant informed the Arbitrator that they agreed that Plaintiff Kucera could pursue her claims in court.

21. Accordingly, on June 4, 2025, the AAA closed this matter.

22. Despite exercising reasonable diligence, Plaintiffs were unaware of Defendant's conduct because Defendant affirmatively represented that users could block unnecessary cookies, including those cookies associated with personalized advertising and analytics, while simultaneously concealing that such tracking would occur regardless of users' selections. This combination of misrepresentation and omission prevented Plaintiffs from discovering their claims earlier. Further, Plaintiff Kucera's claims were equitably tolled by the filing of the arbitration proceeding because Defendant had notice of the claims (and her intent to pursue them in court as a putative class action). These circumstances, including Defendant's concealment, misleading representations and Plaintiff Kucera's pursuit of her claims in the arbitration proceeding, warrant tolling of the statute of limitations.

## SUBSTANTIVE ALLEGATIONS

### A. Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies.

23. Every website, including the Website, is hosted by a server that sends and receives communications in the form of HTTP requests, such as "GET" or "POST" requests, to and from Internet users' browsers. For example, when a user clicks on a hyperlink on the Website, the user's browser sends a "GET" request to the Website's server. The GET request tells the Website server what information is being requested (e.g., the URL of the webpage being requested) and instructs the Website's server to send the information back to the user (e.g., the content of the webpage being requested). When the Website server receives an HTTP request, it processes that request and sends back an HTTP response. The HTTP request includes the client's IP address, which allows the Website server to identify the origin of the request and return the response.

24. An IP address (Internet Protocol address) is a unique numerical label assigned to each device connected to a network that uses the Internet Protocol for communication, typically expressed as four sets of numbers separated by periods (e.g., 192.168.123.132 for IPv4 addresses). IP addresses can identify the network a device is on and the specific device within

that network. Public IP addresses used for internet-facing devices reveal geographical locations, such as country, city, or region, through IP geolocation databases.

25. As a result, Defendant knew or should have known that the devices used by Plaintiffs and Class members to access the Website were located in California.

26. Defendant voluntarily integrated "third-party resources" from the Third Parties into its Website programming. "Third-party resources" refer to tools, content or services provided by third parties, such as analytics tools, advertising networks, or payment processors, that a website developer utilizes by embedding scripts, styles, media, or an application programming interface (API) into the website's code. Defendant's use of the third-party resources on the Website is done so pursuant to agreements between Defendant and those Third Parties.

27. The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device. As described below, cookies generally contain a unique identifier which enables the website to recognize and differentiate individual users. Cookie files are sent back to the website server along with HTTP requests, enabling the website to identify the device making the requests, and to record a session showing how the user interacts with the website.

28. First-party cookies are those that are placed on the user's device directly by the web server with which the user is knowingly communicating (in this case, the Website's server). First-party cookies are used to track users when they repeatedly visit the same website.

29. A third-party cookie is set by a third-party domain/webserver (e.g., www.youtube.com; analytics.tiktok.com; alb.reddit.com, etc.). When the user's browser loads a webpage (such as a webpage of the Website) containing embedded third-party resources, the third parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier

that allows the third-party to recognize and differentiate individual users across websites (including the Website) and across multiple browsing sessions.

30. As described further below, the third-party cookies stored on and/or loaded from users' devices when they interact with the Website are transmitted to those third parties, enabling them to surreptitiously track in real time and collect Website users' personal information, such as their browsing activities and private communications with Defendant, including the following:

- **Browsing History**: Information about the webpages a Website user visits, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;
- **Visit History**: Information about the frequency and total number of visits to the Website;
- **Website Interactions:** Data on which links, buttons, or ads on the Website a user clicks;
- **User Input Data**: The information the user entered into the Website's form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information;
- **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with Website content;
- **Interests and Preferences**: Insights into user interests based on the types of Website content viewed, products searched for, or topics engaged with;
- **Shopping Behavior**: Information about the Website products viewed or added to shopping carts;
- **Device Information**: Details about the Website user's device, such as the type of device (mobile, tablet, desktop), operating system, and browser type;
- **Referring URL**: Information about the website that referred the user to the Website;

- **Session Information**: Details about the user's current Website browsing session, including the exact date and time of the user's session, the session duration and actions taken on the Website during that session;
- **User Identifiers**: A unique ID that is used to recognize and track a specific Website user across different websites over time; and/or
- **Geolocation Data**: General location information based on the Website user's IP address or GPS data, if accessible, including whether the user is located in California.

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

31. Third-party cookies can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing campaigns); (ii) personalization (e.g., remembering a user's browsing history and content preferences to enable content recommendations); (iii) advertising/targeting (e.g., delivering targeted advertisements based on the user's consumer profile (i.e., an aggregated profile of the user's behavior, preferences, and demographics); and (iv) social media integration (e.g., enabling sharing of users' activities with social media platforms). Ultimately, third-party cookies are utilized to enhance website performance and generate revenue through data collection and targeted advertising.

32. Defendant designs, manufactures, markets, and sells a wide variety of consumer electronics and related products, including televisions, cameras, headphones, speakers, home theater systems, audio equipment, and other electronic devices. Defendant owns and operates the Website, which allows visitors to, among other things, obtain information regarding Defendant's products; browse and search for products; review product descriptions, features, specifications, and prices; compare products and models; explore product options and accessories; check product availability; locate nearby retailers; access product support and other informational resources; and purchase products. As users interact with the Website—including by entering information into search fields and forms, searching for particular products, browsing

product categories and individual products, reviewing product features and specifications, comparing products and prices, selecting product options and accessories, checking product availability, clicking links, and making other selections—they communicate Private Communications to Defendant, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

33. Defendant chose to install or integrate its Website with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit the Website, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendant incorporates into its Website, or that Defendant causes to be loaded. Because Defendant controls the Website's software code, and is capable of determining whether a user is accessing the Website from California, it has complete control over whether first-party and third-party cookies are placed on its California users' devices and/or transmitted to third parties.

34. Defendant describes the third-party cookies used on the Website as follows in its Privacy Policy:

> In addition to any information that you choose to provide to us, whenever you visit or interact with the Properties or our content, SEL, as well as our third-party analytics and advertising providers or other service providers, may use a variety of technologies that automatically or passively collect information and metadata about how the Properties are accessed and used ("Usage Information"). Usage Information may include, without limitation, browser type, operating system, the page served, time spent on the Properties, the pages you have viewed, clickstream data and location information.
>
> SEL may also automatically collect your IP address, or other unique device identifiers ("Device Identifiers") for the computer, mobile device, technology or other device (each, a "Device") you use to access the Properties. A Device Identifier is a number that is automatically assigned to your Device when you access the Properties or our servers, so that our systems can identify your Device. We may also collect an Advertising ID (such as the Android AAID), which is assigned by the platform operator for the applicable Device.
>
> The technologies used on the Properties to collect Usage Information and/or Device Identifiers by us or third parties include:
>
> Cookies. "Cookies" (which may be .html files, or other technology) are small text files that help store user preferences and activity. A Cookie is placed on a

Device when it is used to visit the Properties or otherwise access our online offerings. Cookies may be used for many purposes, such as remembering you and your preferences, tracking your visits to our web pages and customizing your experience on the Properties. You may configure your browser or Device to block the use of cookies. Please refer to Advertising and Analytics Providers and Your Choices section for more information , including how to manage or opt-out of certain cookies. For more information about cookies and managing cookies generally, visit http://www.allaboutcookies.org.

Web Beacons. "Web beacons" (also known as image tags, pixel tags, GIFS or web bugs) are small pieces of code used to collect advertising data, such as counting page views, promotion views or advertising responses. Web beacons or similar technologies may be used for various purposes, including, without limitation, to count visitors to the Properties, to monitor how users navigate the Properties, to count how many sent e-mails were actually opened or to determine whether content sent was actually viewed.

Embedded Scripts. "Embedded scripts" are programming codes that are designed to collect information about your interactions with the Properties, such as the links you click on. The code is temporarily downloaded onto your Device from our server or a third-party service provider, is active only while you are connected to the Properties, and is deactivated or deleted thereafter.

…

Third parties may also use technologies that automatically collect personal information about your online activities over time and across different websites when you visit or use our Properties or other online websites and services. For example, some third parties' embedded content or plugins on the Properties, such as social media sharing tools, allow them to learn that you or your Device have visited or interacted with our Properties, and they may combine this information with other, identifiable information they have collected about your visits to other websites or online services. These third parties may handle this information, and other information they directly collect through their content and plugins, pursuant to their own privacy policies.

We may collect information about your location from your Device. In some cases, this may include the precise location of your Device. We may collect location information using different types of technologies, including IP address, GPS or Wi-Fi. If you use one of our mobile applications, we may also access your Device's location information in the background when you give us permission. You may be able to turn off the collection of precise location information through the settings on your Device. In addition, some mobile service providers may also provide us or our service providers with information regarding the physical location of a Device used to access the Properties.[1]

---

[1] Sony Electronics Inc. Privacy Policy (***Last Updated and Effective:*** March 1, 2026) (available at https://electronics.sony.com/privacy-policy) (the "Privacy Policy"). On information and belief, a substantially similar version of this Privacy Policy was in effect at the time of Plaintiffs' declination of cookies on the Website.

**B. Defendant Falsely Informed Users That They Could Decline the Website's Use of "All" Cookies.**

35. When Plaintiffs and other consumers in California visited the Website, the Website immediately displayed to them a popup cookie consent banner. As shown in the screenshot below, the cookie consent banner stated, "This website and our advertising, analytics and similar partners use cookies to operate this website, personalize your experience, serve advertisements and/or analyze traffic. By using our site, you acknowledge this notice and agree to the use of cookies on our site and to our Privacy Policy." The banner then purported to provide users the opportunity, rather than choosing to "Accept All" cookies, to instead "Decline All" cookies, as shown in the following screenshot from the Website:




36. Plaintiffs and other Website users who clicked or selected the "Decline All" link, thereby indicating their choice and/or agreement to decline or reject all cookies and tracking technologies in use on the Website, could then continue to browse the Website, as the popup cookie consent banner disappeared.

37. Defendant's popup cookie consent banner led Plaintiffs, and all those Website users similarly situated, to believe that they declined or rejected all cookies and tracking technologies, especially those that were used to "personalize your experience, serve advertisements and/or analyze traffic." The banner further reasonably led Plaintiffs and those Website users similarly situated to believe that Defendant would not allow third parties, through

cookies, to access their Private Communications with the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon clicking or selecting the "Decline All" link.

38. Defendant's representations, however, were false. In truth, Defendant did not abide by Plaintiffs' or other users' wishes. When Plaintiffs and other Website users clicked or selected the "Decline All" link, they provided notice to Defendant that they did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Website.

39. Nevertheless, even after receiving that notice, Defendant caused third-party tracking cookies, including the Third Parties' cookies, to be placed on Website users' browsers and devices and/or transmitted to the Third Parties, thereby enabling the Third Parties to collect user data in real time that discloses Website visitors' Private Communications, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even when consumers like Plaintiffs tried to protect their privacy by rejecting cookies, Defendant failed to prevent cookies from being transmitted to the Third Parties, enabling them to track user behavior and communications.

40. Some aspects of the operations of the Third-Party cookies on the Website can be observed using specialized tools that log incoming and outgoing Website network transmissions. The following screenshot, obtained using one such tool, shows examples of Third-Party cookies being transmitted from a Website user's device and browser to Third Parties even after the user clicked or selected the "Decline All" link on the Website's popup cookie consent banner.




41. The screenshot above shows the "Network" tab of Chrome Developer Tools, which contains a list of HTTP network traffic transmissions between the user's browser and various third-party websites while the user visited and interacted with Defendant's Website at https://electronics.sony.com. The screenshots depict only network traffic occurring ***after*** the user

declined all cookies using the cookie banner. As shown above, despite the user's declination of all cookies, the user's interactions with the Website resulted in the user's browser making a large number of GET and POST HTTP requests to third-party web domains like www.youtube.com; analytics.tiktok.com; alb.reddit.com, and others. As further shown in the right-hand column of the screenshots, the user's browser sent cookies along with those HTTP requests to the third parties. These screenshots demonstrate that Defendant caused third-party cookie data and users' Private Communications to be transmitted to Third Parties, even after consumers declined or rejected all cookies and tracking technologies by clicking or selecting the "Decline All" link. All of these network calls are made to the Third Parties without the user's knowledge, and despite the user's declination of all cookies.

42. Plaintiffs' and other Website users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, were surreptitiously obtained by the Third Parties via these cookies.

43. As users interact with the Website, even after clicking or selecting the "Decline All" link, more data regarding users' behavior and communications are intercepted by the Third Parties alongside the cookie data. This occurs despite users' rejection of unnecessary cookies and similar technologies for personalization, advertising, analytics, and the sale or sharing of personal information with third parties for such purposes. The third-party cookies that Defendant wrongfully allows to be stored on users' devices and browsers, and to be transmitted to the Third Parties, cause the Third Parties to track and collect data on users' behaviors and communications, including Private Communications, on the Website. Because third-party cookies cause the Third Parties to track users' behavior across the Internet and across time, user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target

advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

44. The Third-Party code that the Website causes to be loaded and executed by the user's browser constitutes a wiretap because, when it is executed, it causes the Third Parties—separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When the Third Parties use their respective wiretaps on Website users' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail below.

### C. The Private Communications Collected As a Result of Third-Party Cookies Transmitted When Visiting Defendant's Website.[2]

#### 1. The Website Causes the Interception of the Contents of Communications.

45. The Website includes search bars and other input fields through which users enter information. For example, below are screenshots of the search bars currently available on the Website where users can type into the search box to cause the Website to search its contents. One search bar allows users to search for products available on the Website, as shown by the following screenshot:

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

[2] This section contains multiple examples of specific data being sent from a user's browser to third parties. Each example was collected after the user elected to "Decline All" cookies.




46. When users input the information into this search field, they intend to communicate the contents of their searches directly to the Website.

47. Instead, Defendant programmed the Website such that the contents of those communications are transmitted to, and intercepted by, the Third Parties while the communications are in transit between users' browsers and the Website.

48. For example, the Website causes users' search queries to be transmitted to third parties, including TikTok, even after users have chosen to "Decline All" cookies. When a user submits a search, the Website loads a results page that includes the user's query in the URL. The Website then transmits that URL to third parties, thereby disclosing the full search query to those parties. For instance, a test search phrase ("yellow headphones") was transmitted to TikTok's analytics.tiktok.com domain, along with associated identifiers and metadata. This transmission is shown in the following screenshot:




**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

49. Further, when a user added an item to their virtual shopping cart using the e-commerce features available on the Website, Defendant sent additional cookie data to Google and Reddit. Data sent to Reddit, for example, included the following:

| | |
|---|---|
| event | AddToCart |
| external_id | |
| id | t2_68nhj9ga |
| idfa | |
| integration | gtm |
| m.conversionId | |
| m.currency | USD |
| m.customEventName | |
| m.itemCount | 1 |
| m.products | [{"id":"WF1000XM5/B","name":"WF1000XM5/B","category":"N/A"}] |

**2. Google Cookies.**

50. Defendant causes third-party cookies to be transmitted between Website users' browsers and devices and the **youtube.com** and **google.com** domains[3], even after users "Decline All." Each of these domains is associated with Google LLC's digital advertising and analytics platform that collects user information via cookies to assist Google in performing data collection, behavioral analysis, user retargeting, and analytics.[4] Website users' browsers automatically send Google their page URL and IP address.[5] Further, the Website permits Google to set cookies on the Website users' browsers and read cookies that are already there.[6] Google serves targeted ads to web users across Google's ad network, which spans millions of websites and apps. Nearly

[3] *See* Advertising (available at http://policies.google.com/technologies/ads).
[4] *See* Our advertising and measurement cookies (available at https://business.safety.google/adscookies/).
[5] *See* How Google uses information from sites or apps that use our services (available at http://policies.google.com/technologies/partner-sites).
[6] *Id.*

20% of web traffic is tracked by Google's DoubleClick cookies.[7] Google's cookies help it track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. Further, by identifying users who have shown interest in certain products or content, Google's cookies cause its advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Google's ad network.[8]

51. Specifically, Google sends cookies when a web user visits a webpage that shows Google Marketing Platform advertising products and/or Google Ad Manager ads.[9] "Pages with Google Marketing Platform advertising products or Google Ad Manager ads include ad tags that instruct browsers to request ad content from [Google's] servers. When the server delivers the ad content, it also sends a cookie. But a page doesn't have to show Google Marketing Platform advertising products or Google Ad Manager ads for this to happen; it just needs to include Google Marketing Platform advertising products or Google Ad Manager ad tags, which might load a click tracker or impression pixel instead." *Id.* As Google explains, "Google Marketing Platform advertising products and Google Ad Manager send a cookie to the browser after any impression, click, or other activity that results in a call to our servers." *Id.*

52. Google also uses cookies in performing analytical functions. As Google explains, "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights into [] business[es]."[10] "To measure a website … [one] add[s] a small piece of JavaScript measurement code to each page on [a] site." *Id.* Then, "[e]very time a user visits a webpage, the tracking code will collect … information about how that user interacted with the page." *Id.* Google Analytics enables website owners to "measure when someone loads a page,

---

[7] *See, e.g.* https://www.ghostery.com/whotracksme/trackers/doubleclick.

[8] *See, e.g.* About cross-channel remarketing in Search Ads 360 (available at https://support.google.com/searchads/answer/7189623?hl=en); About dynamic remarketing for retail (available at https://support.google.com/google-ads/answer/6099158?hl=en&sjid=1196213575075458908-NC).

[9] *See* How Google Marketing Platform advertising products and Google Ad Manager use cookies (available at https://support.google.com/searchads/answer/2839090?hl=en&sjid=1196213575075458908-NC); *see also* Cookies and user identification (available at https://developers.google.com/tag-platform/security/concepts/cookies).

[10] How Google Analytics Works (available at https://support.google.com/analytics/answer/12159447?hl=en).

clicks a link, [ ] makes a purchase;" "completes a purchase"; "searches [] website or app";"select content on [] website or app"; "views an item"; and "views their shopping cart".[11]

53. Google's cookies allow it to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data, including whether a user is located in California.[12]

54. Google's own Privacy & Terms materials provide that Google "store[s] a record of the ads we serve in our logs."[13] "These server logs typically include your web request, IP address, browser type, browser language, the date and time of your request, and one or more cookies that may uniquely identify your browser or, if you are signed-in, that may uniquely identify you."[14] Google then uses location information to infer the Website users' demographic information.[15]

55. For example, the Google software code that Defendant causes to be stored on and executed by the Website user's device causes the following data to be sent to Google's domain, at play.google.com:

---

[11] Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://developers.google.com/analytics/devguides/collection/ga4/events).

[12] *See* About the Google Tag (available at https://support.google.com/searchads/answer/7550511?hl=en); How Floodlight Recognizes Users (available at https://support.google.com/searchads/answer/2903014?hl=en); How Google Ads tracks website conversions (available at https://support.google.com/google-ads/answer/7521212); Google Ads Help, Cookie: Definition (available at https://support.google.com/google-ads/answer/2407785?hl=en); About demographic targeting in Google Ads (available at https://support.google.com/searchads/answer/7298581?hl=en&sjid=1196213575075458908-NC&visit_id=638670675669576522-2267083756&ref_topic=7302618&rd=1); How Google Analytics Works (https://support.google.com/analytics/answer/12159447); Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://support.google.com/analytics/answer/9267735).

[13] *See* Advertising (available at https://policies.google.com/technologies/ads?hl=en).

[14] *Id.*

[15] *Id.*

POST 200 https://play.google.com/log?format=j

Request Header Query Body Form Cookies Raw Summary +

| Key | Value |
| --- | --- |
| :authority | play.google.com |
| :method | POST |
| :path | /log?format=json&hasfast=true&authuser=0 |
| :scheme | https |
| accept | */* |
| accept-encoding | gzip, deflate, br |
| accept-language | en-US,en;q=0.9 |
| content-length | 822 |
| content-type | application/x-www-form-urlencoded;charset=UTF-8 |
| cookie | 1P_JAR=2024-02-04-22; NID=511=HYJJbrjzQWJ4U-dCaVid6ZoqMvXLBQYqm7Ae6_MOXjHtNjTRBmoszwjnASIFTBV9JCUBVyT_Bo7y3JS6N5AJEBMkoX3n5QaJeQqt2nkJT1DjVBZc3A_APRm44zg7D52U5XBswAtQ-RsGiONUasK-vRcxPO8L_XWxNR0E8HIxvMdW01g0_z1z5WjyqOSwZCzEpFCt |
| origin | https://pay.google.com |
| referer | https://pay.google.com/ |
| sec-ch-ua | "Not A(Brand";v="99", "Google Chrome";v="121", "Chromium";v="121" |
| sec-ch-ua-mobile | ?0 |
| sec-ch-ua-platform | "macOS" |
| sec-fetch-dest | empty |
| sec-fetch-mode | cors |
| sec-fetch-site | same-site |
| user-agent | Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/121.0.0.0 Safari/537.36 |
| user-agent | Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/121.0.0.0 Safari/537.36 |
| x-client-data | CJS2yQEIpbbJAQipncoBCMTnygEIk6HLAQiGoM0BCLrIzQEIg/DNARj1yc0BGKfqzQEYyvjNARjrjaUX |
| x-goog-authuser | 0 |
| Host | play.google.com |


POST
200
https://play.google.com/log?format=j
Request Header Query Body Form Cookies Raw Summary +
Key
Value
authuser
0
format
json
hasfast
true
POST
200
https://play.google.com/log?format=js
Request Header Query Body Form Cookies Raw Summary FORM
1
[[1,null,null,null,null,null,null,null,null,null,[null,
null,null,null,"en-US",null,
"boq_instantbuyfrontendserver_20240202.00_p0",null,
[[["Not A(Brand","99"],["Google Chrome","121"],
["Chromium","121"]],0,"macOS","13.5.0","arm","","121.0.
6167.139"],[1,0,0,0,0]]],809,[["1707087008687",null,
null,null,null,null,null,"[[\"https://electronics.sony.
com\",\"27151C75-3E38-4AC0-8F78-655DF05275CD.
PRODUCTION\",5,5],16,[463,1707087008224,301],[]]",null,
null,null,null,null,null,28800,[null,null,null,"[null,
null,[93801494,48887052,48824046,48887080,47824009,
48596897,93880157,93804554,93826861,1734055,93874002,
1714245,1706538,48401070,48696729,1743268,93814382,
48744542,1736056,48753681,48630313,48650879,47807561,
48887022,48887064,93880141,93804524,93826574,93873986,
93814366,71847096]]"],null,null,null,null,11]],
"1707087008687"]
POST
200
https://play.google.com/log?format=js
Request Header Query Body Form Cookies Raw Summary +
Key
Value
1P_JAR
2024-02-04-22
NID
511=HYJJbrjzQWJ4U-
dCaVid6ZoqMvXLBQYqm7Ae6_MOXjHtNjTRBmoszwj
nASIFTBV9JCUBVyT_Bo7y3JS6N5AJEBMkoX3n5QaJ
eQqt2nkJT1DjVBZc3A_APRm44zg7D52U5XBswAtQ-
RsGiONUasK-
vRcxPO8L_XWxNR0E8HIxvMdW01g0_z1z5WjyqOSw
ZCzEpFCt

56. The "NID" cookie is also used for Google advertising. Specifically, it is used to show Google ads to users.[16]

57. Similarly, the following data was sent to Google's www.youtube.com domain when the user browsed the Website:




| Key | Value |
|---|---|
| :authority | www.youtube.com |
| :method | GET |
| :path | /s/player/a1d7d0f8/www-widgetapi.vflset/www-widgetapi.js |
| :scheme | https |
| accept | */* |
| accept-encoding | gzip, deflate, br |
| accept-language | en-US,en;q=0.9 |
| cookie | LOGIN_INFO=AFmmF2swRglhALCSfbYBmcKq5ScjOKBu7a3THwLjZkuOoikZEZjtRjRwAiEA03KdGmAxyAoEQr7ct0cMiya3prV2A-wWgDGHDMIGcdU:QUQ3MjNmemRMSU1KRndzZVk2X2hZVDNPeVlHa3FCM3FCb3JyYXZSUWpvazNRbG1pY0xPVUh1WG5JSXNRbXgySS1BMlRZakhoT21jQ1Q5cnlrd2lCS3dFcXp4MkFWdFJuYk1SNDBMRlMyYk9ZUUtoaDVVSUtBd1BLZ0s4RlR2ZUtaaHE2Ykg2ZXNYUnlrc3BsLVMzaW9KM0Y0RUlHNy16VDh3; __Secure-3PAPISID=1ntoUi6QP93K_hRG/AP07E6GoGAgCOt5M5; __Secure-3PSID=fghMHzHBVIRCYUDXZ9Y5eIO7emV4jX5iWGJnuhWaL758dr5aleZR7bmabvHaSGh1Iw3jzQ.; __Secure-3PSIDTS=sidts-CjIBPVxjSrpOvyKnxTnON_b5mCy_FQAj5VhM6ZXXMT1PWmxSdThVNGfnkW-znPg5ZNLauRAA; YSC=Y3jLroPCk_4; VISITOR_INFO1_LIVE=3Zahnrk7wgU; __Secure-3PSIDCC=ABTWhQFeaDYZLvD1zSg0E_ZxR7GJjXWpFIQCVeABnOnpMrap6uBjmf_IxACq-ak9DoB0Gf-pZNo |

[16] https://policies.google.com/technologies/cookies?hl=en-US.

| | |
|---|---|
| referer | https://electronics.sony.com/ |
| sec-ch-ua | "Not A(Brand";v="99", "Google Chrome";v="121", "Chromium";v="121" |
| sec-ch-ua-mobile | ?0 |
| sec-ch-ua-platform | "macOS" |
| sec-fetch-dest | script |
| sec-fetch-mode | no-cors |
| sec-fetch-site | cross-site |
| user-agent | Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/121.0.0.0 Safari/537.36 |
| x-client-data | CJS2yQEIpbbJAQipncoBCMTnygEIk6HLAQiGoM0BCLrIzQEIg/DNARj1yc0BGKfqzQEYyvjNARjrjaUX |
| Host | www.youtube.com |

58. The "user-agent" header corresponds to the device and browser that the user has used to access the Website.

59. Finally, the data sent to Google contains the user's IP address.

60. Because Google's cookies operate across multiple sites (i.e., cross-site tracking), the cookie enables Google to track users as they navigate from one site to another, and to comprehensively observe and evaluate user behavior online. Google states that when users visit sites or apps using Google's ad or analytics services, "those services may link information about your activity from that site or app with activity from other sites or apps that use our services."[17] Google's advertising platform aggregates user data to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics and audience segments based on shared traits (such as females, Millennials, etc.), and to perform targeted advertising and marketing analytics.

61. Google's consumer profiles span across the user's devices and across households.[18] Google states that it "may infer whether activity from different devices, browsing sessions, or accounts is associated," and links mobile advertising IDs to advertising cookies "to

[17] *See* Why Google collects data (available at https://policies.google.com/privacy?fg=1&hl=en-GB).
[18] *See* Advertising (available at https://policies.google.com/technologies/ads?hl=en).

coordinate ads across [users'] mobile apps and mobile browser."[19] Users may then receive ads on household connected TVs related to the web or app activity from devices within their household.[20]

62. Thus, the Google cookies used on the Website enable Google to track users' interactions with advertisements to help advertisers understand how users engage with ads across different websites. Further, the user data collected through the cookie enables the delivery of personalized ads based on user interests and behaviors. For instance, if a user frequently visits travel-related websites, Google will show her more travel-related advertisements. Further, the collected data is used to generate reports for advertisers, helping them assess the performance of their ad campaigns and make data-driven decisions (such as renaming their products). Further, Google's advertising platform enables advertisers to retarget marketing, which Google explains allows advertisers to "show previous visitors ads based on products or services they viewed on your website. With messages tailored to your audience, dynamic remarketing helps you build leads and sales by bringing previous visitors back to your website to complete what they started."[21]

63. Further, in its "Shared Data Under Measurement Controller-Controller Data Protection Terms," Google states: "Google can access and analyze the Analytics data customers share with us to better understand online behavior and trends, and improve our products and services—for example, to improve Google search results, detect and remove invalid advertising traffic in Google Ads, and test algorithms and build models that power services like Google Analytics Intelligence that apply machine-learning to surface suggestions and insights for customers based on their analytics data and like Google Ads that applies broad models to improve ads personalization and relevance. These capabilities are critical to the value of the products we deliver to customers today."[22] Thus, Google can have the capability to use the data

---

[19] *Id.*
[20] *Id.*
[21] Dynamic remarketing for web setup guide (available at https://support.google.com/google-ads/answer/6077124).
[22] Shared Data Under Measurement Controller-Controller Data Protection Terms (available at https://support.google.com/analytics/answer/9024351).

it collects for understanding online behavior and trends, machine learning, and improving its own products and services.

**3. TikTok Cookies.**

64. Defendant also causes third-party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to "Decline All" cookies, to and from the **analytics.tiktok.com** domain. This domain is associated with TikTok for Business, a suite of tools offered by TikTok USDS Joint Venture LLC. The TikTok social media platform is used to create and share short-form videos, and it utilizes cookies for various purposes including assisting brands and marketers to create, manage, and optimize ad campaigns on the platform.[23]

65. TikTok utilizes analytics.tiktok.com cookies to collect data on user interactions with websites that have integrated TikTok's tracking technologies (such as the Website). These cookies are used to "measure and improve the performance of your advertising campaigns and to personalize the user's experience (including ads) on TikTok."[24] TikTok further explains that it uses cookies to "match events with people who engage with your content on TikTok. Matched events are used to improve measurement and optimize ad campaigns. They can also contribute to building your retargeting and engagement audiences." *Id.* These cookies enable TikTok to recognize and track users across different sessions and domains (i.e., cross-site tracking) and to collect and synchronize user data to observe and evaluate TikTok user behavior.

66. These cookies enable TikTok to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, including *email addresses and phone numbers*; (v) demographic information, (vi) interests and

---

[23] *See, e.g.*, TikTok for Business (https://ads.tiktok.com/business/en-US/products/ads; and https://ads.tiktok.com/business/en-US/products/measurement); TikTok Business Help Center; Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

[24] TikTok Business Help Center; Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

preferences, (vii) shopping behaviors, (viii) device information, (ix) session information, (x) user identifiers, and (xi) geolocation data in the form of the IP address.[25]

67. For example, the TikTok software code that Defendant causes to be stored on and executed by the Website user's device causes the following data to be sent to TikTok's domain, at analytics.tiktok.com, when the user views a product page on the Website, even after the user has selected the "Decline All" link on the Website's popup cookie consent banner:

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

---

[25] *Id.*; *see also* TikTok for Business: Enhance Data Postback with the TikTok Pixel (https://ads.tiktok.com/help/article/enhance-data-postback-with-the-tiktok-pixel?lang=en); TikTok for Business: Advanced Matching for Web (available at https://ads.tiktok.com/help/article/advanced-matching-web?redirected=1); TikTok for Business: About TikTok Pixel (available at https://ads.tiktok.com/help/article/tiktok-pixel?lang=en).

POST 200 https://analytics.tiktok.com/api/v2/

Request Header Query Body Cookies Raw Summary +

| Key | Value |
| --- | --- |
| :authority | analytics.tiktok.com |
| :method | POST |
| :path | /api/v2/pixel/act |
| :scheme | https |
| accept | */* |
| accept-encoding | gzip, deflate, br |
| accept-language | en-US,en;q=0.9 |
| content-length | 2202 |
| content-type | text/plain;charset=UTF-8 |
| cookie | _ttp=2ajlUbVwqq4ibxBk7BS9uB5amel |
| origin | https://electronics.sony.com |
| referer | https://electronics.sony.com/ |
| sec-ch-ua | "Not A(Brand";v="99", "Google Chrome";v="121", "Chromium";v="121" |
| sec-ch-ua-mobile | ?0 |
| sec-ch-ua-platform | "macOS" |
| sec-fetch-dest | empty |
| sec-fetch-mode | no-cors |
| sec-fetch-site | cross-site |
| user-agent | Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/ 121.0.0.0 Safari/537.36 |
| Host | analytics.tiktok.com |

POST 200 https://analytics.tiktok.com/api/v2/pi

Request Header Query Body Cookies Raw Summary + PLAIN


```
{
  "message_id":
  "messageId-1707087007951-8072777004938",
  "event_id": "",
  "is_onsite": false,
  "timestamp": "2024-02-04T22:50:07.951Z",
  "context": {
    "ad": {
      "sdk_env": "external",
      "jsb_status": 2
    },
    "user": {
      "anonymous_id": "K7T_qErIlzKbv_wzmZdv9t5_etH"
    },
    "pixel": {
      "code": "CI0D0N3C77U2H86M29K0",
      "runtime": "1",
      "codes": "CI0D0N3C77U2H86M29K0"
    },
    "page": {
      "url": "https://electronics.sony.com/cart",
      "referrer": "https://electronics.sony.com/audio/
      headphones/truly-wireless-earbuds/p/wf1000xm5-b"
    },
    "library": {
      "name": "pixel.js",
      "version": "2.1.33"
    },
    "device": {
      "platform": "pc"
    },
    "session_id":
    "f16e911d-c3ae-11ee-a5d9-b8cef6a7d4d8::vQZre9mzU72R
    BQ7JzLbV",
```

```
    "pageview_id":
    "pageId-1707087007203-9817434848358",
    "variation_id": "default",
    "userAgent": "Mozilla/5.0 (Macintosh; Intel Mac OS
    X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko)
    Chrome/121.0.0.0 Safari/537.36",
    "index": 3
  },
  "_inspection": {},
  "signal_diagnostic_labels": {
    "raw_email": {
      "label": "missing"
    },
    "raw_auto_email": {
      "label": "missing"
    },
    "raw_phone": {
      "label": "missing"
    },
    "raw_auto_phone": {
      "label": "missing"
    },
    "hashed_email": {
      "label": "missing"
    },
    "hashed_phone": {
      "label": "missing"
    }
  },
  "properties": {},
  "action": "Metadata",
  "auto_collected_properties": {
    "page_trigger": "PageView",
```

```
    "content_data": {
      "open_graph": "{\"og:site_name\":\"Sony Electronics\",\"og:url\":\"https://electronics.sony.com/cart\",\"og:type\":\"Website\",\"og:description\":\"The WF-1000XM5 features cutting-edge technology to deliver premium sound quality and the best truly wireless noise-canceling performance on the market.\",\"og:title\":\"Cart\",\"og:image\":[\"https://d1ncau8tqf99kp.cloudfront.net/media/sony-logo-200.png\",\"https://d1ncau8tqf99kp.cloudfront.net/media/sony-logo-200.png\"]}",
      "microdata": "[]",
      "json_ld": "[{\"@context\":\"http://schema.org\",\"@type\":\"Organization\",\"name\":\"Sony Electronics\",\"url\":\"https://electronics.sony.com/cart\",\"foundingDate\":\"February 15, 1960\",\"contactPoint\":[{\"@type\":\"ContactPoint\",\"telephone\":\"+1-800-249-7669.\",\"contactType\":\"Store Support\"}],\"sameAs\":[\"https://www.facebook.com/SonyElectronics\",\"http://www.twitter.com/sonyelectronics\",\"http://www.instagram.com/SonyElectronics/\",\"https://youtube.com/Sony\"]}]",
      "meta": "{\"title\":\"Cart\"}"
    }
  }
}
```


POST 200 https://analytics.tiktok.com/api/v2/pi

Request Header Query Body Cookies Raw Summary +

| Key | Value |
| --- | --- |
| _ttp | 2ajlUbVwqq4ibxBk7BS9uB5amel |

68. The data includes the "session_id," which is a unique identifier generated by TikTok to track a user's activity. This allows TikTok to correlate the user's behavior from a browsing session, including page views and conversions, to a particular user to enhance advertising measurement, attribution, and targeting.[26]

69. The data further indicates, among other things, that the user has viewed the page on the Defendant's website corresponding to the "WF-1000XM5" earbuds.

[26] *See, e.g.*, How to get TikTok session id? (available at https://gbtimes.com/how-to-get-tiktok-session-id/).

70. According to TikTok's documentation, the "_ttp" cookie is one of the company's advertising cookies, the purpose of which is "[t]o measure and improve the performance of your advertising campaigns and to personalize the user's experience (including ads) on TikTok."[27] The "_ttp" cookie is created and owned by TikTok on TikTok's server and is used to recognize and match events across different websites, is enabled by default, and lasts 13 months from the last date it was used.[28]

71. Further, as shown above, the TikTok software code that Defendant causes to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to TikTok.

72. As discussed above with respect to Google, the "user-agent" corresponds to the device and browser that the user has used to access the Website.

73. Finally, the data sent to TikTok includes the user's IP address, which can be (and is) used to determine whether a user is located in California.

74. By collecting this user data, TikTok performs user behavior tracking, i.e., monitoring user actions like page views, clicks, and interactions to understand user engagement; advertising optimization, i.e., gathering data to enhance the relevance and effectiveness of TikTok advertising campaigns; and performance measurement (i.e., assessing the success of marketing efforts by analyze user responses to ads and content).[29]

75. Further, TikTok's marketing materials provide that its Automatic Advanced Matching feature allows advertisers to use cookies to "[m]atch your website visitors with people on TikTok, to expand audience sizes for solutions like web retargeting."[30] TikTok's Automatic Advanced Matching feature functions as follows: "When a visitor lands on your website and inputs customer information during registration, sign-in, contact, or checkout on a website where you installed your pixel, Automatic Advanced Matching will capture information from those

---

[27] *See* TikTok for Business: Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).
[28] TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel).
[29] *See* TikTok for Business: Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).
[30] TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel).

fields. …TikTok will use hashed information to link event information to people on TikTok. TikTok may use matched events to better attribute events to TikTok ads, optimize advertisers' future campaigns, and depending on advertisers' and users' settings, TikTok may also add people to advertisers' retargeting or engagement audiences."[31]

**4. Reddit Cookies.**

76. Defendant also causes third-party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to decline all cookies, to and from the alb.reddit.com domain.

77. The **reddit.com** domain is owned by Reddit, Inc., a popular online platform where "users connect over shared interests, participate in discussions, and learn about what's relevant in the world."[32] Businesses can leverage the platform for marketing and advertising businesses to "build brand awareness, drive purchase consideration for [ ] products, and drive sales by engaging in subreddit conversations, sharing valuable (or even exclusive) content, and using Reddit Ads."[33] Reddit cookies and tracking technologies allow businesses to "track redditors who have interacted with your website and to craft personalized ads to keep them engaged."[34] Reddit cookies can be used to identify and target advertisements to users based on "previous clicks, likes, or comments, you nurture leads and guide them toward making a purchase or taking another desired action."[35] Further, using Reddit's audience targeting features allow businesses to "reach users based on their interests and passions in the places where they're most engaged" and target audience segments based on gender, location, interests, devices, and more.[36]

---

[31] TikTok for Business: How to set up Automatic Advanced Matching (available at https://ads.tiktok.com/help/article/how-to-set-up-automatic-advanced-matching?lang=en).
[32] https://www.business.reddit.com/learn/what-is-reddit.
[33] *Id.*
[34] https://www.business.reddit.com/advertise/targeting.
[35] https://www.business.reddit.com/advertise/targeting/custom/.
[36] https://business.reddithelp.com/s/article/Overview-Reddit-Ads-Audience-and-Targeting; https://business.reddithelp.com/s/article/demographics#gender-targeting; https://business.reddithelp.com/s/article/demographics#location-targeting; https://business.reddithelp.com/s/article/reddit-audiences; and https://business.reddithelp.com/s/article/demographics.

78. These cookies allow these Third Parties to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) demographic information, (v) interests and preferences, (vi) shopping behaviors, (vii) device information, (viii) referring URLs, (ix) session information, (x) user identifiers, and/or (xi) geolocation data—including whether a user is located in California.

79. For example, when the user added a product to the Website's virtual shopping cart, even after the user had selected the "Decline All" link on the Website's popup cookie consent banner, the following data was sent to Reddit's alb.reddit.com domain:

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

GET

200

https://alb.reddit.com/rp.gif?ts=1707087005400
=USD&m.transactionId=&m.customEventName=&m.pro
y%22%3A%22N%2FA%22%7D%5D&m.conversionId=&uuid=
0&sh=2240&sw=1260&v=rdt_26e8ea0f&dpm=&dpcc=&dp

**Request** Header Query Body Cookies Raw | Summary +

| Key | Value |
|---|---|
| :authority | alb.reddit.com |
| :method | GET |
| :path | /rp.gif?ts=1707087005400&id=t2_68nhj9ga&event=AddToCart&m.itemCount=1&m.value=&m.valueDecimal=undefined&m.currency=USD&m.transactionId=&m.customEventName=&m.products=%5B%7B%22id%22%3A%22WF1000XM5%2FB%22%2C%22name%22%3A%22WF1000XM5%2FB%22%2C%22category%22%3A%22N%2FA%22%7D%5D&m.conversionId=&uuid=71750027-a3bd-4ff2-aec7-3b16ecf56980&aaid=&em=&external_id=&idfa=&integration=gtm&opt_out=0&sh=2240&sw=1260&v=rdt_26e8ea0f&dpm=&dpcc=&dprc= |
| :scheme | https |
| accept | image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8 |
| accept-encoding | gzip, deflate, br |
| accept-language | en-US,en;q=0.9 |
| cookie | loid=000000000ru3oobrlb.2.1704958006887.Z0FBQUFBQmxuNWcydjZOWlhBbU9uN280bl8xN3Y3M2FrejhpMWpwT2IyNDNsUzBDSjJ2aEdFem96WWZCaTJhZnNaenN2c1czTU53Z3JMMmc2SUlVUHVWYWRJMEJEY2ZzVUwzUklSX2duQnE2VzlMdFBWaTAyQnFTTzN5ckFfNWRfb1htem40WFBZWWU; csv=2 |
| referer | https://electronics.sony.com/ |
| sec-ch-ua | "Not A(Brand";v="99", "Google Chrome";v="121", "Chromium";v="121" |
| sec-ch-ua-mobile | ?0 |
| sec-ch-ua-platform | "macOS" |
| sec-fetch-dest | image |
| sec-fetch-mode | no-cors |
| sec-fetch-site | cross-site |
| user-agent | Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/121.0.0.0 Safari/537.36 |
| Host | alb.reddit.com |


GET
200
https://alb.reddit.com/rp.gif?ts=1707087005400
=USD&m.transactionId=&m.customEventName=&m.pro
y%22%3A%22N%2FA%22%7D%5D&m.conversionId=&uuid=
0&sh=2240&sw=1260&v=rdt_26e8ea0f&dpm=&dpcc=&dp
Request Header Query Body Cookies Raw Summary +
Key
Value
dpcc
dpm
dprc
em
event
AddToCart
external_id
id
t2_68nhj9ga
idfa
integration
gtm
m.conversionId
m.currency
USD
m.customEventName
m.itemCount
1
m.products
[{"id":"WF1000XM5/B","name":"WF1000XM5/B","category":"N/A"}]
m.transactionId
m.value
m.valueDecimal
undefined
opt_out
0
sh
2240
sw
1260
ts
1707087005400
uuid
71750027-a3bd-4ff2-aec7-3b16ecf56980
v
rdt_26e8ea0f


GET
200
https://alb.reddit.com/rp.gif?ts=1707087005400&i
=USD&m.transactionId=&m.customEventName=&m.produ
y%22%3A%22N%2FA%22%7D%5D&m.conversionId=&uuid=71
0&sh=2240&sw=1260&v=rdt_26e8ea0f&dpm=&dpcc=&dprc
Request
Header
Query
Body
Cookies
Raw
Summary
Key
Value
loid
000000000ru3oobrlb.2.1704958006887.Z0FBQUFBQmxuNWcydjZOWlhBbU9uN280bl8xN3Y3M2FrejhpMWpwT2lyNDNsUzBDSjJ2aEdFem96WWZCaTJhZnNaenN2c1czTU53Z3JMMmc2SUlVUHVWYWRJMEJEY2ZzVUwzUklSX2duQnE2VzlMdFBWaTAyQnFTTzN5ckFfNWRfb1htem40WFBZWWU
csv
2

80. The "event" parameter discloses to Reddit that the user added an item to the shopping cart ("AddToCart"), and the "m.products" parameter identifies the product (the WF-1000XM5 earbuds). The "sh" and "sw" parameters disclose the user's screen dimensions.

**D. The Third Parties Intercept User Communications While in Transit.**

81. On information and belief, the Third Parties intercept user communications while those communications are in transit from consumers' browsers to Defendant's Website. The Third Parties operate large-scale data ingestion systems designed to receive, read, and act upon incoming data streams in real time, as the data is transmitted over the network, before it is committed to storage. As the user data is transmitted over the wire, it is transmitted as a raw payload that cannot be used until the Third Party reads and processes it using at least the steps described below. These steps necessarily require contemporaneous access to the contents of the communications while they are in transit.

82. First, the Third Parties must read the data in real time in order to ***transform*** it into a usable format for subsequent processing. Transforming, for example, may involve converting long html-encoded strings and decoding them to a format such as Unicode Transformation Format, which is more amenable to subsequent processing.

83. Second, the Third Parties read the data in real time in order to ***deduplicate*** events transmitted through multiple channels. Most websites transmit the same user interaction twice: both directly from the user's device and separately through a server-to-server API, to ensure reliability.[37] Third Party platforms encourage this redundant configuration and automatically compare identifiers contained within the transmitted data—such as event identifiers and device identifiers—to determine whether multiple transmissions correspond to the same user action.[38] This deduplication occurs as the communications are received, before they are stored.

---

[37] For example, Google's server-to-server API is the **Google Ads Conversion API**. TikTok uses the **TikTok Events API**. On information and belief, each of the Third Parties uses a server-to-server API to collect user data.

[38] For example, Facebook recommends that websites use a "redundant setup" whereby "advertisers implement the Conversions API alongside their Meta Pixel." *See* "Handling Duplicate Pixel and Conversions API Events," available at https://developers.facebook.com/docs/marketing-api/conversions-api/deduplicate-pixel-and-server-events. Facebook confirms that its system automatically deduplicates events using various parameters included with the data, such as "event_id," "event_name," "fbp," and "external_id." *Id.*

84. Third, the Third Parties read and analyze incoming communications in real time to ***validate*** and ***filter*** the data, including to detect invalid, malicious, or anomalous transmissions and to determine whether the data complies with internal processing rules. These determinations must be made immediately upon receipt of the communication in order for the Third Parties' systems to function.

85. Fourth, the Third Parties perform real-time ***analytics*** on user communications to determine their meaning and significance. This processing is used to interpret the data, associate it with particular users or devices, and to determine what real-time events or actions should be taken in response, such as triggering advertising delivery, notifications, or other automated responses. This step typically involves applying artificial intelligence and machine learning algorithms to the data. These determinations occur while the data is in motion, prior to final storage.

86. To accomplish each of the functions described above, the Third Parties employ real-time stream processing platforms specifically designed to operate on data "in flight"—that is, after it is transmitted from a user's browser but before it is committed to the Third Parties' storage. Examples of such platforms include Apache Flink, Kafka, and Amazon Kinesis. Industry documentation confirms that these systems are designed to read, transform, analyze, and act upon data streams as they are received.

87. On information and belief, the Third Parties also use ingest-phase processing platforms that perform real-time analytics and filtering on incoming data streams before storage. For example, Google developed MillWheel, an internal stream processing system, as well as Flume/FlumeJava, which evolved into Google Cloud Dataflow.[39] Google Cloud Dataflow enables Google to perform many functions on real-time data at the "Ingest" phase, before it is stored.[40] Google, which sells Dataflow to third party developers for use with their own products, states that Dataflow is used "to create data pipelines that read from one or more sources,

---

[39] *See, e.g.*, Google Cloud Blog, "How cloud batch and stream data processing works" (August 2020), https://cloud.google.com/blog/products/data-analytics/how-cloud-batch-and-stream-data-processing-works.
[40] Google Cloud Blog, "BigQuery explained: An overview of BigQuery's architecture" (September 2, 2020), https://cloud.google.com/blog/products/data-analytics/new-blog-series-bigquery-explained-overview.

***transform the data***, and write the data to a destination."[41] One use for Dataflow is the "[r]eal-time machine learning (ML) analysis of streaming data."[42] Google confirms that Dataflow is "suitable for more advanced applications, such as real-time streaming analytics."[43]

88. Accordingly, the Third Parties' platforms do not operate as passive recipients that merely record user communications. Instead, they function as active interceptors that contemporaneously read and process the contents of user communications—including the Private Communications—by transforming, deduplicating, validating and filtering and analyzing in real time while those communications are in transit between the user's browser and Defendant's Website.

**E. The Private Communications Collected are Valuable.**

89. As part of its regular course of business, Defendant targets California consumers by causing the Third Parties to extract, collect, maintain, distribute, and exploit for Defendant's and the Third Parties' profit, all of the Private Communications transferred by the cookies which Defendant causes to be placed on Plaintiffs' and other California Website users' devices without their knowledge or consent. Defendant knew the location of consumers like Plaintiffs and the Class members either prior to or shortly after causing the Third Parties to use cookies on their devices.

90. The Private Communications tracked and collected through cookies on the Website are valuable to Defendant and the Third Parties. Defendant uses this data to measure and optimize marketing campaigns, evaluate website design and product placement, and target specific users or groups of users with advertising. For example, Defendant can identify California users who visit webpages related to particular consumer electronics products and then target those users with advertisements for similar products both on the Website and across unrelated third-party websites.

---

[41] Google Cloud Documentation, "Dataflow overview," https://docs.cloud.google.com/dataflow/docs/overview (emphasis added).
[42] *Id.*
[43] *Id.*

91. Data reflecting users' browsing activity allows Defendant to identify behavioral patterns, preferences, and interests relating to Defendant's products. At scale, this data enables Defendant to assess trends across its brands and within the broader consumer electronics market. Defendant monetizes this data by leveraging it to increase user engagement, advertising effectiveness, and overall revenue.

92. The value of the Private Communications tracked and collected by the Third Parties using cookies on the Website can be quantified. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium."[44] Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id*. "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id*.

93. Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell her data or the consumer's willingness to pay to protect her information.

94. By falsely representing consumers' ability to "Decline All" non-required cookies, and by aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties to collect users' Private Communications, Defendant unjustly enriches itself at the expense of consumer privacy and autonomy. Defendant deprives consumers of the ability to decide whether, and on what terms, their data may be monetized.

## PLAINTIFFS' EXPERIENCES

**Plaintiff Mario Margiotta**

95. Plaintiff Margiotta visited the Website on multiple occasions, including in or around November 2024 and November 2025, while located in California, to seek and obtain information about Sony's products. Specifically, Plaintiff Margiotta visited the Website to research Sony's SA-SW3 subwoofer before purchasing it, including to review pricing information and instruction manuals.

---

[44] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

96. Plaintiff Margiotta's visits to the Website were consistent with an ordinary Website user's visits seeking information about Defendant's products. During his visits, Plaintiff Margiotta used the Website's search bar and support section to research the SA-SW3 subwoofer, reviewed pricing information and instruction manuals, and viewed suggested products to determine whether the subwoofer was compatible with his soundbar. Plaintiff Margiotta is not a consumer advocate, a "tester," or a compliance auditor who visited the Website to test or evaluate Defendant's privacy practices.

97. When Plaintiff Margiotta visited the Website, it immediately detected that he was a visitor in California and presented him with Defendant's popup cookie consent banner, which provided the option to select the "Decline All" cookies link. Plaintiff Margiotta viewed Defendant's representation on the popup cookie consent banner that, "This website and our advertising, analytics and similar partners use cookies to operate this website, personalize your experience, serve advertisements and/or analyze traffic. By using our site, you acknowledge this notice and agree to the use of cookies on our site and to our Privacy Policy." Plaintiff Margiotta also viewed Defendant's additional representation that, rather than choosing to "Accept All" cookies, users could instead "Decline All" cookies, including those cookies used to "personalize your experience, serve advertisements and/or analyze traffic."

98. Plaintiff Margiotta selected and clicked the "Decline All" link. Plaintiff Margiotta believed that selecting the "Decline All" link on the popup cookie consent banner found on the Website would allow him to opt out of, decline, and/or reject all cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks, analytics services, and/or similar companies for the purposes of providing personalized content, advertising, and analytics services).

99. In selecting the "Decline All" link, Plaintiff Margiotta gave Defendant notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff Margiotta specifically declined or rejected, based on Defendant's representations, those cookies used to "personalize your experience, serve advertisements and/or

analyze traffic" and share information with third parties. In reliance on these representations and promises, only then did Plaintiff Margiotta continue browsing the Website.

100. Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for personalized content, advertising, and analytics, to be placed on Plaintiff Margiotta's device and/or transmitted to the Third Parties along with user data, without Plaintiff Margiotta's knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff Margiotta that he could decline or reject the use and/or placement of all cookies and tracking technologies while he browsed the Website was false. Contrary to what Defendant made Plaintiff Margiotta believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendant had already caused that to happen.

101. Then, as Plaintiff Margiotta continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner, and despite Plaintiff Margiotta's clear declination or rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing personalized content, advertising, and analytics from the Third Parties on his device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Margiotta's Private Communications as Plaintiff Margiotta browsed the Website.

102. Defendant's representations that consumers could "Decline All" cookies while Plaintiff Margiotta and users browsed the Website, or at least those involved in providing personalized content, advertising, and analytics, were untrue. Had Plaintiff Margiotta known this fact, he would not have used the Website. Moreover, Plaintiff Margiotta reviewed the popup cookie consent banner prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to decline or reject all cookies, Plaintiff Margiotta would have noticed it and

would not have used the Website or, at a minimum, he would have interacted with the Website differently.

103. Plaintiff Margiotta continues to desire to browse content featured on the Website. Plaintiff Margiotta would like to browse websites that do not misrepresent that users can decline "All" cookies and tracking technologies. If the Website were programmed to honor users' requests to decline all cookies and tracking technologies, Plaintiff Margiotta would likely browse the Website again in the future, but will not do so until then. Plaintiff Margiotta regularly visits websites that feature content similar to that of the Website. Because Plaintiff Margiotta does not know how the Website is programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Website honors users' requests to decline all cookies and tracking technologies, Plaintiff Margiotta will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Margiotta is not a software developer and has not received training with respect to HTTP network calls.

**Plaintiff Kristen Kucera**

104. Plaintiff Kucera visited the Website to seek and obtain information about Sony's products, while located in California, on one or more occasions during the last four years.

105. Plaintiff Kucera's visits to the Website were consistent with an ordinary Website user's visits seeking information about Defendant's products. Specifically, Plaintiff Kucera is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendant's privacy practices.

106. When Plaintiff Kucera visited the Website, it immediately detected that she was a visitor in California and presented her with Defendant's popup cookie consent banner, which

provided the option to select the "Decline All" cookies link. Plaintiff Kucera viewed Defendant's representation on the popup cookie consent banner that, "This website and our advertising, analytics and similar partners use cookies to operate this website, personalize your experience, serve advertisements and/or analyze traffic. By using our site, you acknowledge this notice and agree to the use of cookies on our site and to our Privacy Policy." Plaintiff Kucera also viewed Defendant's additional representation that, rather than choosing to "Accept All" cookies, users could instead "Decline All" cookies, including those cookies used to "personalize your experience, serve advertisements and/or analyze traffic."

107. Plaintiff Kucera selected and clicked the "Decline All" link. Plaintiff Kucera believed that selecting the "Decline All" link on the popup cookie consent banner found on the Website would allow her to opt out of, decline, and/or reject all cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks, analytics services, and/or similar companies for the purposes of providing personalized content, advertising, and analytics services).

108. In selecting the "Decline All" link, Plaintiff Kucera gave Defendant notice that she did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff Kucera specifically declined or rejected, based on Defendant's representations, those cookies used to "personalize your experience, serve advertisements and/or analyze traffic" and share information with third parties. In reliance on these representations and promises, only then did Plaintiff Kucera continue browsing the Website.

109. Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for personalized content, advertising, and analytics, to be placed on Plaintiff Kucera's device and/or transmitted to the Third Parties along with user data, without Plaintiff Kucera's knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff Kucera that she could decline or reject the use and/or placement of all cookies and tracking technologies while she browsed the Website was false. Contrary to what Defendant made Plaintiff Kucera believe, she did not have

a choice about whether third-party cookies would be placed on her device and/or transmitted to the Third Parties along with her user data; rather, Defendant had already caused that to happen.

110. Then, as Plaintiff Kucera continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner, and despite Plaintiff Kucera's clear declination or rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing personalized content, advertising, and analytics from the Third Parties on her device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Kucera's Private Communications as Plaintiff Kucera browsed the Website.

111. Defendant's representations that consumers could "Decline All" cookies while Plaintiff Kucera and users browsed the Website, or at least those involved in providing personalized content, advertising, and analytics, were untrue. Had Plaintiff Kucera known this fact, she would not have used the Website. Moreover, Plaintiff Kucera reviewed the popup cookie consent banner prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to decline or reject all cookies, Plaintiff Kucera would have noticed it and would not have used the Website or, at a minimum, she would have interacted with the Website differently.

112. Plaintiff Kucera continues to desire to browse content featured on the Website. Plaintiff Kucera would like to browse websites that do not misrepresent that users can decline "All" cookies and tracking technologies. If the Website were programmed to honor users' requests to decline all cookies and tracking technologies, Plaintiff Kucera would likely browse the Website again in the future, but will not do so until then. Plaintiff Kucera regularly visits websites that feature content similar to that of the Website. Because Plaintiff Kucera does not know how the Website is programmed, which can change over time, and because she does not have the technical knowledge necessary to test whether the Website honors users' requests to decline all cookies and tracking technologies, Plaintiff Kucera will be unable to rely on

Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Kucera is not a software developer and has not received training with respect to HTTP network calls.

## CLASS ALLEGATIONS

113. Plaintiffs bring this Class Action Complaint on behalf of themselves and a proposed class of similarly situated persons, pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following group of similarly situated persons, defined as follows:

> **Class: All persons who browsed the Website in the United States after clicking or selecting the "Decline All" link in the popup cookies consent banner.**

114. This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

115. **Numerosity:** Plaintiffs do not know the exact size of the Class, but they estimate that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

116. **Common Questions Predominate:** This action involves common questions of law and fact to the Class because each class member's claim derives from the same unlawful conduct that led them to believe that Defendant would not cause third-party cookies to be placed on their browsers and devices and/or transmitted to third parties along with user data, after Class members chose to decline all cookies and tracking technologies on the Website, nor would

Defendant permit third parties to track and collect Class members' Private Communications as Class members browsed the Website.

117. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

a. Whether Defendant's actions violate California laws invoked herein; and

b. Whether Plaintiffs and Class members are entitled to damages, restitution, injunctive and other equitable relief, reasonable attorneys' fees, prejudgment interest and costs of this suit.

118. **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, Plaintiffs, like the other Class members, visited the Website, declined cookies, and had their confidential Private Communications intercepted by the Third Parties.

119. **Adequacy of Representation:** Plaintiffs will fairly and adequately protect the interests of all Class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests in conflict with, or antagonistic to, the interests of Class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and those of the Class. By prevailing on their claims, Plaintiffs will establish Defendant's liability to all Class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class members.

120. **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class members' rights and the disposition of their interests through actions to

which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### First Cause of Action: Invasion of Privacy

121. Plaintiffs reallege and incorporate the paragraphs of this Complaint as if set forth herein.

122. To plead an invasion of privacy claim, Plaintiffs must show an invasion of (i) a legally protected privacy interest; (ii) where Plaintiffs had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Defendant constituting a serious invasion of privacy.

123. Defendant has intruded upon the following legally protected privacy interests of Plaintiffs and Class members: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the California Wiretap Acts as alleged herein; (iv) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (v) Plaintiffs' and Class members' Fourth Amendment right to privacy.

124. Plaintiffs and Class members had a reasonable expectation of privacy under the circumstances, as Defendant affirmatively promised users they could "Decline All" cookies and tracking technologies before proceeding to browse the Website. Plaintiffs and other Class members directed their electronic devices to access the Website and, when presented with the popup cookies consent banner on the Website, Plaintiffs and Class members declined all cookies and reasonably expected that their declination of cookies and tracking technologies would be

honored. That is, they reasonably believed that Defendant would not permit the Third Parties to store and send cookies and/or use other such tracking technologies on their devices while they browsed the Website. Plaintiffs and Class members also reasonably expected that, if they declined such cookies and/or tracking technologies, Defendant would not permit the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, on the Website.

125. Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

126. Defendant, in violation of Plaintiffs' and other Class members' reasonable expectation of privacy and without their consent, permits the Third Parties to use cookies and other tracking technologies to collect, track, and compile users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California. The data that Defendant allowed third parties to collect enables the Third Parties—and they in fact do—to, *inter alia*, create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; create audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and perform targeted advertising and marketing analytics. Further, the Third Parties share user data and/or the user profiles to unknown parties to further their financial gain. The consumer profiles are and can be used to further invade Plaintiffs' and users' privacy, by allowing third parties to learn intimate details of their lives, and target them for advertising and other purposes, as described herein, thereby harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them.

127. Defendant's actions constituted a serious invasion of privacy in that it invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications), and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

128. Defendant's intrusion into Plaintiffs' privacy was also highly offensive to a reasonable person.

129. Defendant lacked a legitimate business interest in causing the placement and/or transmission of third-party cookies along with user data that allowed the Third Parties to track, intercept, receive, and collect Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, without their consent.

130. Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

131. Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

132. Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, and willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' declination of the Website's use of cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**Second Cause of Action: Intrusion Upon Seclusion**

133. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

134. To assert a claim for intrusion upon seclusion, Plaintiffs must plead (i) that Defendant intentionally intruded into a place, conversation, or matter as to which Plaintiffs had

a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

135. By permitting third-party cookies to be stored on consumers' devices without consent, which caused the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, in violation of Defendant's representations otherwise in the popup cookie consent banner, Defendant intentionally intruded upon the solitude or seclusion of Website users. Defendant effectively placed the Third Parties in the middle of communications to which they were not invited, welcomed, or authorized.

136. The Third Parties' tracking and collecting of Plaintiffs' and the Class members' Private Communications on the Website using third-party cookies that Defendant caused to be stored on users' devices—and to be intercepted by the Third Parties—was not authorized by Plaintiffs and Class members, and, in fact, those Website users specifically chose to "Decline All" cookies.

137. Plaintiffs and the Class members had an objectively reasonable expectation of privacy surrounding their Private Communications on the Website based on Defendant's promise that users could "Decline All" cookies, as well as state criminal and civil laws designed to protect individual privacy.

138. Defendant's intentional intrusion into Plaintiffs' and other users' Private Communications would be highly offensive to a reasonable person given that Defendant represented that Website users could "Decline All" cookies when, in fact, Defendant caused such third-party cookies to be stored on consumers' devices and browsers, and to be intercepted by third parties, even when consumers declined all such cookies. Indeed, Plaintiffs and Class members reasonably expected, based on Defendant's false representations, that when they declined all cookies and tracking technologies, Defendant would not cause such third-party cookies to be stored on their devices or permit the Third Parties to obtain their Private

Communications on the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

139. Defendant's conduct was intentional and intruded on Plaintiffs' and users' Private Communications on the Website.

140. Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

141. Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

142. Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, and willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' declination of the Website's use of cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

## <u>Third Cause of Action</u>: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631)

143. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

144. California Penal Code § 631(a) provides, in pertinent part:

> Any person [i] who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or [ii] [who] in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [iii] who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or [iv] who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . .

145. Defendant is a "person" within the meaning of California Penal Code § 631.

146. The Third Parties' cookies—as well as the software code of the Third Parties responsible for placing the cookies and transmitting data from user devices to the Third Parties—constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and, even if they do not, Defendant's deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner").

147. Each of the Third Parties is a separate legal entity that offers a software as a service and not merely a passive device. Further, the Third Parties had the capability to use the wiretapped information for their own purposes and, as alleged above, they did in fact use the wiretapped information for their own business purposes. Accordingly, the Third Parties were third parties to any communication between Plaintiffs and Class members, on the one hand, and Defendant, on the other.

148. Under § 631(a), Defendant must show it had the consent of all parties to a communication.

149. At all relevant times, the Website caused Plaintiffs and Class members' browsers to store the Third Parties' cookies and to transmit those cookies alongside Private Communications—including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—to the Third Parties without Plaintiffs' and Class members' consent. By configuring the Website in this manner, Defendant willfully aided, agreed with, employed, permitted, or otherwise caused the Third Parties to wiretap Plaintiffs and Class members using the Third Parties' cookies and to accomplish the wrongful conduct alleged herein.

150. At all relevant times, by their cookies and corresponding software code, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

151. The Private Communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, that the Third Parties automatically intercepted directly convey Website user's affirmative decisions, actions, choices, preferences, and activities, which constitute the "contents" of electronic communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

152. At all relevant times, the Third Parties used or attempted to use the Private Communications automatically intercepted by their cookie tracking technologies for their own purposes.

153. Plaintiffs and Class members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiffs' and Class members' electronic communications. Nor did Plaintiffs and Class members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct. On the contrary, Plaintiffs and Class members expressly declined to allow Third Parties' cookies and tracking technologies to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic communications by choosing to "Decline All" cookies in the consent banner.

154. The wiretapping of Plaintiffs and Class members occurred in California, where Plaintiffs and Class members accessed the Website and where the Third Parties—as caused by Defendant—routed Plaintiffs' and Class members' electronic communications to Third Parties' servers. Among other things, the cookies, as well as the software code responsible for placing the cookies and transmitting them and other Private Communications to the Third Parties, resided on Plaintiffs' California-located device. In particular, the user's California-based device, after downloading the software code from the Third Parties' servers, (i) stored the code onto the user's disk; (ii) converted the code into machine-executable format; and (iii) executed the code, causing the transmission of data (including cookie data) to and from the Third Parties.

155. Plaintiffs and Class members have suffered loss by reason of these violations, including, but not limited to, (i) violation of their right to privacy, (ii) loss of value in their Private Communications, (iii) damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their Private Communications, and (iv) loss of their Private Communications to the Third Parties with no consent.

156. Pursuant to California Penal Code § 637.2, Plaintiffs and Class members have been injured by the violations of California Penal Code § 631, and each seeks statutory damages of the greater of $5,000, or three times the amount of actual damages, for each of Defendant's violations of CIPA § 631(a), as well as injunctive relief.

157. Unless enjoined, Defendant will continue to commit the illegal acts alleged herein including, but not limited to, permitting third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant. Plaintiffs, Class members, and the general public continue to be at risk because Plaintiffs, Class members, and the general public frequently use the internet to search for information and content related to consumer electronics products. Plaintiffs, Class members, and the general public continue to desire to use the internet for that purpose. Plaintiffs, Class members, and the general public have no practical way to know if their request to decline all cookies and tracking technologies will be honored and/or whether Defendant will permit third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant. Further, Defendant has already permitted the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant and will continue to do so unless and until enjoined.

**<u>Fourth Cause of Action</u>: Common Law Fraud, Deceit and/or Misrepresentation**

158. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

159. Defendant fraudulently and deceptively informed Plaintiffs and Class members that they could "Decline All" cookies.

160. However, despite Defendant's representations otherwise, Defendant caused third-party cookies and software code to be stored on consumers' devices, and to be transmitted to the Third Parties alongside Private Communications, even after users clicked or selected the "Decline All" cookies link in the popup cookie consent banner. These cookies and corresponding software code allowed the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' Private Communications, even when consumers had previously chosen to "Decline All" cookies.

161. Defendant affirmatively chose to deploy a cookie consent banner governing the collection, sharing, and use of users' Private Communications on the Website.

162. By implementing the cookie banner, Defendant undertook responsibility for ensuring that the banner accurately communicated users' privacy choices and properly effectuated those choices.

163. Defendant and/or its agents configured and managed which technologies loaded and transmitted data before and after a user selected "Decline All" on the Website's cookie consent banner. On information and belief, Defendant operated, controlled, configured, approved, or maintained settings that permitted the Third Parties' tracking technologies to continue collecting users' Private Communications even after users selected options indicating their choice to "Decline All" cookies and opt out of the collection, use, sale, and/or sharing of their Private Communications.

164. Industry documentation for the consent management platforms and Third Parties' technologies used on the Website explains that website operators, i.e., Defendant, must affirmatively configure consent settings and tag behavior to prevent tracking technologies from firing after users reject cookies. On information and belief, Defendant received, reviewed, or had access to such implementation guidance in deploying the challenged technologies on the Website. On information and belief, Defendant had the ability during the relevant time period to audit, test, configure, disable, or modify, the cookie consent banner, consent-management functionality, and Third-Party tracking technologies operating on the Website. Defendant had information available to it demonstrating that users' purported opt-out selections were not being

honored and that users' Private Communications continued to be collected and transmitted to the Third Parties notwithstanding Defendant's contrary representations.

165. Defendant also used the Third Parties' analytics, advertising, and reporting dashboards to monitor Website traffic, user behavior, advertising performance, and related engagement metrics generated through the challenged cookie and tracking technologies. Through these dashboards and related reporting tools, Defendant had access to information reflecting that user data continued to be transmitted to and processed by the Third Parties notwithstanding users' purported opt-out selections. Defendant routinely reviewed, monitored, and relied upon data generated through the Third Parties' resources for advertising, analytics, personalization, attribution, and/or website performance purposes.

166. Industry standards, privacy frameworks, and applicable statutes and regulations, including The California Consumer Privacy Act and related regulations, require website operators deploying cookie consent banners to ensure that consent mechanisms function properly and accurately record and enforce user choices. *See*, *e.g*., California Consumer Privacy Rights Act Regulations, Cal. Code Regs. Tit. 11, § 7025(c) (enumerating requirements for businesses that receive an "opt out preference signal."); *id*. § 7101 (business record keeping requirements regarding opt out requests).

167. On information and belief, Defendant either knew its representations regarding users' ability to "Decline All" cookies and opt out of data sharing were false, lacked any reasonable basis for believing those representations were true, or made those representations carelessly and recklessly despite information available to Defendant demonstrating that users' data continued to be collected and transmitted to the Third Parties after users attempted to opt out.

168. These misrepresentations and omissions were known exclusively to, and actively concealed by Defendant, not reasonably known to Plaintiffs and Class members, and material at the time they were made. Defendant's misrepresentations and omissions concerned material facts that were essential to Plaintiffs' and Class members' decisions as to whether to use the Website. In misleading Plaintiffs and Class members and not so informing them, Defendant breached its

duty to Plaintiffs and Class members. Defendant also gained financially from, and as a result of, its breach.

169. Plaintiffs and Class members relied to their detriment on Defendant's misrepresentations and fraudulent omissions.

170. Plaintiffs and Class members have suffered an injury-in-fact, including the loss of money and/or property, as a result of Defendant's unfair, deceptive, and/or unlawful practices, including the unauthorized interception of their Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, which have value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Plaintiffs and Class members have also suffered harm in the form of diminution of the value of their private and personally identifiable information and communications.

171. Defendant's actions caused damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their personal information and communications.

172. Defendant's representation that consumers could decline all cookies (including those cookies used to "personalize [user] experience, serve advertisements and/or analyze traffic") if they clicked or selected the "Decline All" link was false. Again, had Plaintiffs and Class members known these facts, they would not have used the Website. Moreover, Plaintiffs and Class members reviewed the popup cookie consent banner prior to their interactions with the Website. Had Defendant disclosed that it caused third-party cookies to be stored on Website visitors' devices used for personalization, advertising, and analytics and/or for the sale or sharing of information with third parties even after they choose to decline all such cookies, Plaintiffs and Class members would have noticed it and would not have interacted with the Website.

173. By and through such fraud, deceit, misrepresentations and/or omissions, Defendant intended to induce Plaintiffs and Class members to alter their positions to their detriment. Specifically, Defendant fraudulently and deceptively induced Plaintiffs and Class

members to, without limitation, use the Website under the mistaken belief that Defendant would not permit third parties to obtain users' Private Communications when consumers chose to decline all cookies. As a result, Plaintiffs and the Class provided more personal data than they would have otherwise.

174. Plaintiffs and Class members justifiably and reasonably relied on Defendant's misrepresentations and omissions, and, accordingly, were damaged by Defendant's conduct.

175. As a direct and proximate result of Defendant's misrepresentations and/or omissions, Plaintiffs and Class members have suffered damages, as alleged above, and are entitled to just compensation, including monetary damages.

176. Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, and willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' declination of the Website's use of cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**Fifth Cause of Action: Unjust Enrichment**

177. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

178. Defendant created and implemented a scheme to increase its own profits through a pervasive pattern of false statements and fraudulent omissions.

179. Defendant was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could "Decline All" cookies and by permitting the Third Parties to store and transmit cookies on Plaintiffs' and Class members' devices and browsers, which permitted the Third Parties to track and collect users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, even after Class members declined all such cookies.

180. Plaintiffs' and Class members' Private Communications have conferred an economic benefit on Defendant.

181. Defendant has been unjustly enriched at the expense of Plaintiffs and Class members, and Defendant has unjustly retained the benefits of its unlawful and wrongful conduct.

182. Defendant appreciated, recognized, and chose to accept the monetary benefits that Plaintiffs and Class members conferred onto Defendant at their detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of Plaintiffs and Class members.

183. It would be unjust for Defendant to retain the value of Plaintiffs' and Class members' property and any profits earned thereon.

184. There is no justification for Defendant's enrichment. It would be inequitable, unconscionable, and unjust for Defendant to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

185. Plaintiffs and Class members are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs and Class members to the position they occupied prior to having their Private Communications tracked and collected by the Third Parties.

186. Plaintiffs plead this claim separately and in the alternative to their other claims, to the extent those claims do not provide an adequate legal remedy.

## PRAYER FOR RELIEF

**WHEREFORE**, reserving all rights, Plaintiffs, on behalf of themselves and the Class members, respectfully request judgment against Defendant as follows:

A. Certification of the proposed Class, including appointment of Plaintiffs' counsel as class counsel;

B. An award of compensatory damages, including statutory damages where available, to Plaintiffs and Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, including both pre- and post-judgment interest thereon;

C. An award of punitive damages;

D. An award of nominal damages;

E. An order for full restitution;

F. An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

G. An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

H. For reasonable attorneys' fees and the costs of suit incurred; and

I. For such further relief as may be just and proper.

Dated: October 30, 2026

**GUTRIDE SAFIER LLP**

*/s/ Seth A. Safier*

Seth A. Safier (State Bar No. 197427)
seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Plaintiffs*

# EXHIBIT A

**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
marie@gutridesafier.com
Kali R. Backer (State Bar No. 342492)
kali@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Claimant*

**AMERICAN ARBITRATION ASSOCIATION**

**SAN FRANCISCO REGIONAL OFFICE**

| | |
|---|---|
| KRISTEN KUCERA,<br><br>Claimant,<br><br>v.<br><br>SONY ELECTRONICS, INC.,<br><br>Respondent. | Arbitration Case No.<br><br>**COMPLAINT AND DEMAND FOR ARBITRATION** |

Claimant Kristen Kucera ("Claimant") brings this action against Sony Electronics, Inc. ("Respondent" or "Sony"). Claimant's allegations against Sony are based upon information and belief and upon investigation of Claimant's counsel, except for allegations specifically pertaining to Claimant, which are based upon Claimant's personal knowledge. Claimant files this Complaint and Arbitration Demand without waiver of any right or argument, specifically, and without limitation, that she did not assent to the Sony website's Terms of Use, including the arbitration agreement contained therein, and/or that the purported arbitration agreement is unlawful and/or unenforceable.

## INTRODUCTION

1. This Complaint and Arbitration Demand concerns one issue: whether a valid and enforceable arbitration agreement was formed between the parties to cover a separate dispute about Respondent's internet cookie practices that is not part of this Complaint nor at issue in this proceeding. For purposes of context, that underlying dispute relates to Claimant's visit to

Respondent's website (electronics.sony.com, the "Website"), where, despite Claimant's agreement with Respondent that it would not place tracking cookies on her device, Respondent proceeded to do so anyway. As is relevant to the instant dispute, the Website also contains Website Terms of Use ("TOU" or "Terms") with an arbitration provision purporting to require "any disagreement, cause of action, claim, controversy, or proceeding" between website visitors and Respondent to be resolved by binding arbitration. Claimant contends that no agreement to arbitrate was ever formed. Respondent contends that the arbitration provision in the TOU is applicable to the underlying dispute and refused to consent to litigate the underlying dispute in federal court. Accordingly, Claimant filed this arbitration demand to seek a declaration from the arbitrator that her underlying cookie dispute with Respondent is not subject to arbitration.

2. The Website's TOU are available on the Website but accessible only via an inconspicuous link displayed in small font at the bottom of the Website after all the main content. Moreover, Respondent does not require Website users to read or agree to the Terms before browsing the Website.

3. When Claimant visited the Website, she did not see or otherwise assent to the TOU before choosing to "Decline All" cookies and browse the website. Accordingly, Claimant made no agreement to arbitrate her underlying cookie dispute.

## BACKGROUND ON THE UNDERLYING COOKIE DISPUTE

4. This underlying dispute in this matter concerns an egregious privacy violation and total breach of consumer trust in blatant violation of California law. The Website is configured to use a multitude of cookies to enable third parties to track users' activity and communications on the Website.

5. However, at least until placed on notice by Claimant,[1] the Website presented all visitors immediately with a popup cookies consent banner in which Respondent informed visitors that "[t]his website and our advertising, analytics and similar partners use cookies to

[1] On or about February 12, 2024, Claimant notified Respondent of its ongoing invasions of privacy and alleged violations of law, as described herein, as required under California's Consumers Legal Remedies Act, Cal. Civil Code §§ 1750 *et seq*., and Consumer Privacy Rights Act, Cal. Bus. & Prof. Code §§ 1798, *et seq*.

operate this website, personalize your experience, serve advertisements, and/or analyze traffic." The popup cookies banner also indicated that, rather than choosing to "Accept All" cookies, users can instead select or click a link to "Decline All" cookies, as shown in the following screenshot:




(Screenshot of the Sony Website's popup cookies banner.)

6. Selecting or clicking this "Decline All" link indicates users' choice/agreement to decline or reject **all cookies**. Thousands of visitors to the Website, including Claimant, did just that—they selected or clicked the "Decline All" link to indicate their choice/agreement to decline or reject all cookies, inclusive of those that enable the sale and sharing of their personal data, and then proceeded to browse the Website.

7. Unbeknownst to Claimant and other users, however, Respondent nonetheless caused cookies—both from Respondent and third parties with notorious privacy records, including YouTube and TikTok—to be stored on the devices and browsers of Claimant and those similarly situated, despite their declination or rejection of all cookies. As a result, Respondent caused the sharing, and ultimately the sale, of broad swaths of personal data about Claimant, and similar users, to undisclosed third parties, contrary to Respondent's representations and Claimant's express directions. Claimant brings this arbitration solely to establish that the separate cookie dispute is not arbitrable.

## PARTIES

8. Claimant Kristen Kucera is, and was at all relevant times, an individual and resident of California. Claimant intends to remain in California and makes her permanent home there.

9. Respondent Sony Electronics, Inc. is a Delaware corporation with its headquarters and principal place of business in New York, New York. Respondent does substantial business in California through the Website, and otherwise.

## SUBSTANTIVE ALLEGATIONS

### A. Respondent's Unenforceable Browsewrap Agreement.

10. Respondent's Website includes TOU that purport to govern the use of the Sony Website. *See* TOU ("When you access, browse, or use this Website you accept, without limitation or qualification, the terms and conditions set forth below and any additional terms and conditions of use set forth in any sub-Website."). It is located at the following address: https://electronics.sony.com/terms-of-use.

11. A section of the TOU titled "Dispute Resolution (Including Binding Arbitration)" purports to require Website users to arbitrate all disputes with Respondent through the AAA. *See* TOU ("You and Sony agree that all Disputes shall be resolved exclusively through binding arbitration…It will be administered in keeping with [the Rules] of the American Arbitration Association ('AAA') then in effect when the claim is filed.").

12. Further, the TOU, in calling for arbitration relating to "any disagreement, cause of action, claim, controversy, or proceeding…related to or arising out of…the terms of this Agreement" purports to grant exclusive authority to the arbitrator to determine issues of arbitrability.

13. Claimant, however, did not assent to the TOU or the arbitration provision contained therein. An internet contract is valid only if the user takes some action to unambiguously manifest assent to the contract after the website has placed the user on actual notice of the terms of that contract or has put a reasonably prudent user on inquiry notice of those terms. Claimant never saw the TOU, or even the hyperlink to the "Website Terms," and thus had

no actual notice that her continued browsing of the Website would be subject to an arbitration agreement.

14. Nor did the Website place Claimant on inquiry notice of the TOU because it failed to provide reasonably conspicuous notice of the TOU. Moreover, Claimant took no action, such as clicking a button or checking a box, that unambiguously manifested her assent to the TOU. The Terms on the Website are no more than an unenforceable browsewrap agreement.

15. When users visited the Website, Respondent immediately displayed to them a popup cookies consent banner which prompted users to either "Accept All" cookies, "Decline All" cookies, or "Manage Cookies." The popup cookies banner remains displayed until users make a selection on the banner. The popup cookies banner made no mention of the Website's TOU, contained no link to the TOU, and did not require the user to manifest assent to the Terms.




(Screenshot of the Sony Website's popup cookies banner with no mention of the TOU.)

16. The only link to the TOU appeared in small font (identical to the surrounding font) at the bottom of the Website. Confusingly, the link to the TOU, labeled "Website Terms," was situated near two other links both labeled "Terms & Conditions," which link to other terms that pertain to purchases and Sony's rewards program, and not the Website specifically, as shown in the following screenshot:




(Screenshot of the "Website Terms" link at the bottom of Sony's Website, accompanied by two other links labeled "Terms & Conditions" that each present different sets of terms.)

17. After making their selection on the popup cookies banner, users could then continue to browse the Website, as the popup cookies banner disappeared.

18. The link to the "Website Terms" at the bottom of the Website is not conspicuous. It is not, for example, in a different color, font or size from the surrounding text. Nor is it highlighted or emboldened relative to its surrounding text. Instead, it is very small and much less conspicuous than the images and text elsewhere on the Website. Moreover, it is not available on the Website when a user first visits; rather, they must scroll down to find it with no forewarning of being bound by the Terms. Further, the link to the purportedly binding "Website Terms" is found among links to two other sets of "Terms & Conditions," and it is neither the topmost nor leftmost of these three links, the latter of which users are more likely to see first.

19. Respondent never required Claimant to manifest consent to the TOU. Respondent purports to bind users to the TOU simply by their continued use of the Website, which is legally insufficient even if the notice had been conspicuous.

**B. <u>Claimant's Experiences</u>**

20. During the last year, Claimant visited the Sony Website to browse products.

21. When Claimant visited the Sony Website, the Website immediately presented her with Respondent's popup cookies consent banner as it appeared at the time.

22. Consistent with her typical practice in declining or rejecting cookies and/or the sale of her personal data, Claimant selected and clicked the "Decline All" link, thereby giving Respondent notice that she did not consent to the use or placement of any cookies, including third-party cookies and those cookies that would enable the sale or sharing of her personal data. In reliance on these representations and promises, only then did Claimant continue browsing the Website.

23. Claimant did not see the TOU link—or the actual TOU—on the Website prior to declining or rejecting all cookies, or at any point thereafter.

## CAUSE OF ACTION

### Declaratory Judgment that the Underlying Dispute is Not Subject to Arbitration

24. Claimant realleges and incorporates the paragraphs of this Complaint as if set forth herein.

25. The Sony Website's TOU purports to require arbitration of any and all disputes and to waive users' rights to bring a legal action, including a class action, in court. In particular, the TOU states the following:

> You and Sony agree that all Disputes shall be resolved exclusively through binding arbitration….You also agree that ANY DISPUTE RESOLUTION PROCEEDING WILL ONLY CONSIDER YOUR INDIVIDUAL CLAIMS, AND BOTH PARTIES AGREE NOT TO HAVE ANY DISPUTE HEARD AS A CLASS ACTION, REPRESENTATIVE ACTION, CONSOLIDATED ACTION, OR PRIVATE ATTORNEY GENERAL ACTION.

*See* TOU under the section titled "Dispute Resolution (Including Binding Arbitration)" (available at https://electronics.sony.com/terms-of-use).

26. Claimant did not view, and did not have actual notice of, Respondent's TOU, including the arbitration provision contained therein.

27. The link to the TOU was inconspicuous and failed to provide reasonably prudent users such as Claimant with actual notice that her continued use of the Website would subject her to the TOU.

28. Respondent did not require users such as Claimant to manifest their unambiguous assent to the TOU by clicking a button or checking a box.

29. Claimant, therefore, had no notice, constructive or otherwise, of the TOU and never assented to them.

30. Because Claimant did not assent to the Terms, Claimant is entitled to, and seeks, a declaration that the arbitration provision and class action waiver contained in the TOU are unenforceable and that the underlying dispute described herein is not subject to arbitration.

## PRAYER FOR RELIEF

**WHEREFORE**, reserving all rights, Claimant respectfully requests judgment against Respondent as follows:

31. An order declaring that Claimant did not assent to Respondent's TOU and that the underlying dispute described herein is not subject to arbitration;

32. For reasonable attorneys' fees and the costs incurred; and

33. For such further relief as may be just and proper.

Dated: November 11, 2024

**GUTRIDE SAFIER LLP**

*/s/ Seth A. Safier*
Seth A. Safier (State Bar No. 197427)
seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
marie@gutridesafier.com
Kali R. Backer (State Bar No. 342492)
kali@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Claimant*